UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

COMMUNITY FIRST CREDIT UNION,

    Plaintiff,

v.                                                            Case No. 08-C-57

UNITED STATES OF AMERICA,

    Defendant.

---

**DECISION AND ORDER**

---

A trial is scheduled for May 13, and in advance of that trial both sides have filed motions to exclude expert testimony. At trial, the key question will be whether the Plaintiff's sales of insurance products – credit life and disability insurance, as well as GAP coverage – are "substantially related" to the tax-exempt purpose of Community First Credit Union. *See* 26 C.F.R. (Treas. Reg.) § 1.513-1(d) (activity must "contribute importantly to the accomplishment" of organization's tax-exempt purposes, which "depends in each case upon the facts and circumstances involved," including the "size and extent" of the activity relative to the "nature and extent of the exempt function" it purports to serve). The Plaintiff states that the tax-exempt purpose of a credit union involves: encouraging thrift, providing fair credit, and providing an opportunity for members to improve their social and economic conditions. The motions to exclude are based on relevance, as well as the Supreme Court's directives in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). As I indicated during the pretrial conference, the motions to exclude will be denied in most respects. I address these motions, as well as other open issues, below.

**1. David Birnbaum**

The first filed motion to exclude is Plaintiff's motion to exclude the testimony of David Birnbaum. Plaintiff's general objection to Birnbaum's qualifications can be dealt with summarily. Birnbaum has two degrees from the Massachusetts Institute of Technology. He has worked in the insurance industry – as a state regulator and as a private advocate – for more than two decades. In short, his knowledge of the insurance products at issue here is difficult to question.

Plaintiff's principal arguments are focused elsewhere. One of its key objections to Birnbaum is that he employs an overly narrow definition of "substantially related." In his view, that phrase means "necessary," which is at odds with the applicable regulations and even the opinion of the government's other expert. Moreover, Plaintiff objects, Birnbaum "ignored" Wisconsin law that holds that such income is directly related to the business of credit unions. *See* Wis. Admin Code. DFI-CU § 58.01. Although this is conceivably problematic, I am satisfied that it is not fatal to Birnbaum's testimony. The proper definition of "substantially related," after all, is a question of law about which experts will not be called upon to testify. To the extent he incorporates that definition into his factual opinions, that can easily be cured with cautionary instructions and / or cross-examination, and in fact the government assures the Court that his opinion is hardly as concrete as Plaintiff suggests. And of course the State of Wisconsin's laws governing credit unions are not dispositive of the issue, otherwise this action would not be required. Ultimately, the "substantially related" question is not so arcane or difficult that a jury will be confused by Birnbaum's testimony.

Plaintiff also objects that Birnbaum has no experience in the credit union industry. As such,

he will not be qualified to opine about how insurance products fit into the credit unions' business model. It is true that a well-informed jury in this case will be one that obtains a fair understanding of the business of credit unions. That is the benchmark. That jury will also require an understanding of the insurance products at issue here. Ultimately, the jury will be asked to determine how those insurance products fit within the credit union business model, and the instructions they are given at the close of trial will guide their conclusions. Although Birnbaum is admittedly not an expert in the business of credit unions, he does have expertise in the insurance products being sold. As such, he will be able to assist the jury in understanding them. Moreover, even though he is not an expert on credit unions, he has access to the arguments the Plaintiff is making, namely, that the insurance products being sold relate to the credit unions' mission of encouraging thrift, providing fair credit, and providing an opportunity for members to improve their social and economic conditions. He does not need to be an expert in credit unions to assess how the insurance products being sold fit the particular goals cited by the Plaintiff.

Suppose that instead of credit unions we were dealing with a church that operated a profitable softball league on its grounds. A softball expert might well testify about the sport, the skills required and the values promoted – teamwork, athleticism, etc. And, even though not a theologian, he would be able to explain how a softball league might fit into the *stated* mission of the church. In that case, he is not purporting to be an expert on the church itself, but merely opining about how something within his expertise fits into the goals that the church itself proffers. In other words, if the church says its mission is X, Y, and Z, an expert will not trespass onto the expertise of another if he accepts X, Y, and Z at face value in framing the question for the jury. Similarly, here I conclude that expertise in credit unions is not necessary when the credit union itself explains

3

its tax-exempt goals in fairly straightforward terms.

Finally, I am satisfied that the rest of Birnbaum's testimony is fair game. Plaintiff complains that he is speculating when he imagines other insurance products credit unions could offer, but in reality he seems to be trying to show how the products that *are* offered are suboptimal by comparison. In short, he seems to believe that credit union members are paying too much for the products offered. As such, the products (in his view) do not fit within the credit union's stated goals. This is not a matter of rocket science, and Birnbaum's expertise and methods appear wholly sound.

Plaintiff also objects that Birnbaum has some sort of animus against the credit insurance products being offered. Birnbaum's report reveals that he has a consumer protection approach to credit insurance products. (Dkt. 22, Ex. 1.) For example, reports authored by his advocacy group describe credit insurance as a "rip-off" and allege that consumers are being dramatically overcharged for these products. He has compared credit life insurance to standard term life insurance policies, which would afford similar protection. He concludes that credit insurance is more expensive per $1,000 than a term life policy would be for almost all applicants. He also concludes that the market is plagued by reverse competition. Essentially, the insurers compete for credit unions' business by offering them a richer cut of the commissions, and then the credit union turns around and sells the product to its members. In sum, in his view the lender is the principal beneficiary of credit life insurance. Its loans are protected, but meanwhile the consumer is paying too much and competition is reduced.

The government's case seems largely reliant on this line of argument, namely, that credit and GAP insurance is a bad deal because consumers pay too much for it. Accordingly, they argue,

4

selling credit insurance flies in the face of the credit unions' tax exempt purpose of allowing their members to achieve economic improvement. The insurance business is a zero-sum game, and if the credit unions are making rich profits, their members are bearing the brunt of those costs and are not benefitting at all from the arrangement (in the government's view).

Although I am going to allow this line of testimony to be heard, Birnbaum's testimony raises a number of issues that have not yet been explored because this case, somewhat unusually, did not produce any dispositive motion practice. The unstated, but apparent, premise of the government's argument is that credit life and GAP insurance *could* be substantially related to a credit union's tax-exempt purposes if they were offered at lower rates. That is, no one argues that credit and GAP insurance isn't related to the business of the credit unions – the argument is simply that the premiums charged are too high. If the only objection is to the higher costs of these products, which it seems to be, then it follows that the sales of such products could pass the "substantially related" test if they were cheaper.[1] In essence, the government seems to concede that some types of credit insurance would be substantially related, it is just that these products are not consumer friendly enough because they are too expensive.

The government's objection is one of *degree* rather than *kind*, and that distinction is important because it renders enforcement difficult and predictability nil. If this is really a question of degree, it would seem that credit unions will never know when to pay taxes on credit insurance because the government's test relies on a sliding scale. Where is the elusive line between a rip-off and a reasonably priced insurance product? Will every credit union have to file a refund action to

---

[1] The objection to reverse competition seems essentially an objection to cost. There is nothing inherently wrong with reverse competition; the objection is that the system drives up the price for the purchaser.

5

determine whether the loss-ratio of its insurance products is high enough? And what if there is a spate of car accidents in one year but a dearth in the next? Was the insurance a good deal in the former year but too expensive in the latter? If the government is correct, it is conceivable that not only would the answer to the "substantially related" question turn on the loss-ratios of different products from different credit unions, but the answer could be different every year. This seems an unsatisfactory result.

It might be argued that these are simply problems of enforcement rather than answers to the statutory and regulatory question. If the IRS wants to have a rule that can only be enforced on a case-by-case and year-by-year basis, that is a separate question outside the jurisdiction or expertise of this Court. But this issue opens more than just an administrative and enforcement can of worms. Specifically, the argument the government makes seems to have little bite when applied to a member-owned organization like a credit union. The Plaintiff has represented that 51% of its expenses take the form of dividend payouts to member depositors. If that is true, then its members are actually the beneficiaries of the insurance products in more ways than one. They receive the benefit of belonging to a credit union whose assets are better protected, and if they are depositors they receive the lion's share of the profits from the insurance premiums – the very premiums that are allegedly too rich. Presumably any "excess" in the premiums also produces better services, lower rates, or other benefits, such as the financial education programs Plaintiff touts. Community First is a member-owned financial cooperative organization, and so the "excess" has to be redistributed to the members in some form or another because there are no outside stockholders. It would be one thing if there were allegations of lavish executive perks or waste, but it seems instead that the bulk of the offending premiums is actually going into the pockets of the members

6

who are depositors. If this is an accurate portrayal of the Plaintiff's business, Birnbaum's objections to cost seem crippled.

Moreover, it seems that the relationship between insurance purchasers and non-purchasers is similar to that between lenders and borrowers in a credit union. Surely it does not benefit the economic conditions of members to pay interest when they borrow money, but no one would argue that the charging of interest on credit is somehow unrelated to the credit unions' tax-exempt purposes. The interest paid by borrowers is then returned to the other members who are depositors, and it funds the credit union's other missions. Although some members are winners and some are losers in this scheme, the overall purpose of the credit union is achieved by the charging of interest and paying of dividends. How is insurance any different? Just as some members pay interest on loans, some members can choose to pay for credit or GAP insurance on those loans. Unless the IRS proposes to begin policing the fairness of the interest rates credit unions charge, isn't insurance just another manifestation of the cost- and profit-sharing of the credit union model? Some members benefit if they purchase insurance and experience a loss; while some benefit because the premiums are redistributed in the form of dividends or other benefits. Even if Birnbaum is believed, the members who buy insurance and do not experience a loss are simply subsidizing the gains of the other members. In sum, when we are dealing with a member-owned organization that essentially shares its profits, the government's cost-based argument seems somewhat unusual.[2]

I note that both sides have apparently conceded that these are factual issues requiring resolution by the factfinder. The concerns I have raised may, of course, be argued to the jury by the

---

[2] I note that elsewhere the government argues that it is the membership *on the whole* that counts, not the personal experiences of a few individual members.

7

Plaintiffs. But because these issues have only been touched upon by the parties, and because the premise underlying much of the government's argument seemingly involves substantial questions of law, both sides might consider these issues in framing their case.

**2. Glenn Potts**

The United States has moved to exclude the testimony of Plaintiff's expert, Glenn Potts, a professor of economics at the University of Wisconsin – River Falls. The government asserts that Potts did not review any of the thousands of documents produced in discovery. As such, it argues his report and testimony are not based upon "sufficient facts or data." Fed. R. Evid. 702. Although Potts teaches a college course on banking, the government concedes, that is not sufficient because what's at issue here is the specific business and refund action of Community First Bank. By remaining "willfully ignorant" of the particular facts of this case, the government argues that Potts has forfeited his right to testify.

I am satisfied that Potts may testify for the limited purposes suggested in his report. The jury will obviously be aware that he does not purport to be an expert on the Plaintiff's particular business, but he is an expert on financial institutions, including credit unions. The core issues here are not predominantly dependent on the unique characteristics of Community First Bank – they touch on matters common to all credit unions, and it seems likely that the IRS views the question in general terms as well. For example, IRS revenue rulings finding that diagnostic tests performed on private office patients of tax-exempt hospital's physicians were unrelated business income have had broad application far beyond the particular hospitals at issue. *See* Rev. Rul. 85-109, 1985-2 C.B. 165; Rev. Rul. 85-110, 1985-2 C.B. 166. And, as noted above, the government's expert Birnbaum is not an expert in the credit union business, yet his testimony could indeed be relevant.

8

To the extent Plaintiff's particular business is relevant to this case, the jury will be able to account for that fact in applying or discounting Potts' opinion.

The government chides Potts for coming up with his opinion "almost immediately" upon being retained by Plaintiff, as though his opinion is simply a knee-jerk one or something he tailored merely to please his paying client. But in reality that is not surprising. As noted earlier, although the ultimate question in this case is fact-intensive, it is not the sort of question that requires detailed scientific analysis or lab testing. Presumably, if asked, most experts in the banking field would be able to form an opinion quite quickly about how credit insurance products relate to banking. In short, I am satisfied that Potts' opinions about the general relationship between credit insurance and banking are admissible to aid the jury in its global understanding of the issue. To the extent Potts' opinion is a generalized one, he may be cross-examined and the government may of course underscore that to the jury. But any flaws in his opinion testimony are largely questions of weight rather than admissibility. Accordingly, the motion to exclude will be denied.

**3. Michael Medland**

The United States also moves to exclude part of the testimony of Plaintiff's expert Michael Medland on the basis that he is a rebuttal expert and a large part of his opinions are initial, rather than rebuttal, opinions. (Dkt. # 40, Ex. B.) This is unfair sandbagging, the government argues, because delaying the presentation of Medland's opinion precludes the government from rebutting it. Moreover, the government notes, Medland's initial opinion in this case is suspiciously identical to his (non-rebuttal) opinion in another pending case brought by Plaintiff's counsel. Thus, the government infers, Plaintiff could easily have offered Medland's testimony earlier but deliberately failed to do so.

9

The United States also argues that Medland's testimony is not reliable and improperly strays into questions of law. In particular, the government complains that Medland's expert report refers frequently to Wisconsin law suggesting that the insurance products at issue in this case are, in fact, substantially related to the credit unions' business. This criticism is a salient one. As suggested above, the opinions of Wisconsin's legislators are not dispositive of – or even relevant to – the federal tax question at issue in this case, and references to Wisconsin law to that effect could be confusing to the jury. Moreover, as the government notes, there is a real potential for Medland's testimony to stray into the ultimate legal question (after all, he is an attorney).

As to the rebuttal question, I conclude that Medland's testimony is properly viewed as a rebuttal report. This is not the sort of fact-driven case, such as one involving an auto accident or defective product, where experts will review the physical evidence and come up with differing conclusions and one expert would "rebut" the other. Instead, this case involves is a mixed question of law and fact, and the underlying facts are largely uncontested. It is a battle of policy and philosophy. As such, *any* expert report that disagrees with the other side's report is, by its very nature, a rebuttal to the reports on the other side. In other words, if one side says insurance products are not substantially related, an expert rebutting that opinion need not refer to chapter and verse of the opposing opinion in rebutting it. His own contrary opinion serves as an implied rebuttal. Having reviewed his report, I am satisfied that none of his opinions will unfairly prejudice the government. Instead, they largely echo what the Plaintiff has been arguing since the onset of this case: that credit insurance is a method of managing risk that benefits members by transferring risk to a third-party insurer. It is difficult to imagine how such a straightforward opinion could take the government by surprise. Accordingly, the motion to exclude portions of Medland's testimony will

10

be denied.

**4. Motion to Exclude Members' Testimony**

The government has also moved to bar the testimony of several members of Community First Credit Union. The Plaintiff would have these members testify about the benefits they receive from the credit union. For example, one of the members obtained credit life insurance prior to her husband's death; another member bought GAP coverage in connection with an auto loan. The government objects on the basis of relevance. It asserts that the opinions of four members (out of more than 60,000) would not shed light on the tax issues in this case. Moreover, the central question involves how the insurance products relate to the credit union's exempt purpose on the whole, not merely with respect to a few cherry-picked members.

As the Plaintiff notes, the government's position is based partly on cases dealing with § 501(c)(6) trade associations rather than credit unions. In that context, courts find unrelated business income because (in part) the products being sold do not benefit the group as a whole. Under that line of reasoning, the experiences of a few individual members would not be relevant because what's important is the benefit to the group as a whole. But I find little basis to apply that logic to a case involving a credit union. It is true that the experiences of only a few individuals does not paint a broad picture, but that objection goes to the weight to be given the evidence rather than its admissibility. (And, as Plaintiff notes, the government could have found other members to use as witnesses but chose not to.) These are fact witnesses who may testify about the insurance products they purchased from the credit union and how insurance related to the loans they obtained. They may also support the Plaintiff's position that the insurance products are integral to the credit union's goals by explaining how they were able to personally achieve those goals (e.g., improving

11

their economic position). The government will be able to rebut this evidence (presumably by painting a less rosy picture of how the insurance products work) but I find little basis to exclude the evidence at this stage.

**5. Motion to Play Videotaped Deposition Testimony at Trial**

Finally, Plaintiff has moved for leave to play the videotaped deposition testimony of Michael Schenk at trial. The government opposes the motion on the grounds of relevance. Schenk, an economist at CUNA, the credit unions' national association, would testify about a document CUNA produced entitled, "The Benefits of Membership: Customized Analysis of Member Benefits for Community First CU, December 2005." (Dkt. # 49, Ex. 3.) In short, the document is an effort to compare the Plaintiff's credit union business to banks in Wisconsin. It is apparently prepared specifically for Community First itself, and it contains a number of charts and graphs demonstrative how much value Community First provides its members compared to a bank. Plaintiff argues that the document explains its business and shows how it meets its tax-exempt purposes by providing lower rates and better services to its members. It also serves as a rebuttal, of sorts, to the banking industry's argument that credit unions do not provide significant value to their members. (Schenk Dep., Dkt. # 49, Ex. 2 at 11.) Plaintiff states that, with editing, the video testimony would take about an hour.

As the government notes, the document does not mention any of the insurance products at issue here, and it does not purport to speak to the question of whether those products would be substantially related to the Plaintiff's business. Still, the key question is how the insurance products relate to the credit union business, and information about the business will be required in order to assess that relationship. And, although the report was prepared for 2005 (rather than 2006, which

12

is the relevant tax year), it is apparent that the testimony is directed towards a more general presentation of what overall value a credit union like Community First provides its members. Because this information would be useful in framing the question of how the insurance products fit in with that business, I conclude it is relevant testimony.[3]

**6. Motions in Limine**

Plaintiff filed an omnibus motion in limine addressing several issues that may arise at trial. Many of these issues were resolved upon agreement of the parties and during the pretrial conference. I left several issues open pending further consideration, however, and I address these below. I repeat my observation that pretrial rulings on evidence are preliminary ones, meaning that the fluidity of a trial can cause circumstances to change. Moreover, I note that none of these issues are so inflammatory or prejudicial that cautionary instructions cannot cure any testimony that strays over the line.

Community First stated that it might seek to admit evidence that the IRS did an "about face" in its position regarding the tax implications of the insurance products at issue here. This testimony would be directed towards providing context for why this case was brought – otherwise, the jury might be wondering why the tax issue arose only now despite Community First's decades of being in business. Thus, Community First wishes to show the history of these products and explain that the IRS has never before taken the position that its insurance sales were unrelated taxable income. The government argues that the IRS has never issued official policies on the point, and that this case stands on its own regardless of the IRS's previous policies or practices. Moreover, it argues, this

---

[3]That said, one wonders whether an entire hour of video is even necessary. The report is self-explanatory and the point does not appear particularly complex.

13

case was not the result of any specific IRS actions directed at Community First.

Although I appreciate the government's objections, I do not find the Plaintiff's desire to show some context here to be prejudicial or improper. If the Plaintiff seeks to misstate or overemphasize the legal import of the IRS's previous positions in such a way that the jury might be confused, that line of questioning can be curbed during the trial. Moreover, any suggestion that the IRS's position is somehow unfair because of its novelty would be improper. As all sides agree, the law is not on trial here, and neither is any other application of that law the IRS might have made. But I am satisfied that a reasonable juror might wonder about how a case like this would arise, and to that extent it is fair game for the Plaintiff to explain, albeit briefly, that the IRS's approach to credit union income has changed – or, at least, that it now *has* a position on such income. I do not find any indication that this line of inquiry will be extensive, and I trust that the matter can be framed for the jury without delving into the details of the particular revenue rulings or other IRS memoranda that may be relevant.

I am also satisfied that there is no reasonable reason to bring up the fact that Plaintiff's counsel's fees are being paid by the national credit union association or that this is a "test case." Although the government believes this might also provide some context for the initiation of this lawsuit, namely that Plaintiff is a test-case plaintiff, I simply find no relevance to the point and cannot believe a jury would find it probative of any of the key questions it will be tasked with answering.

The Plaintiff moved that there be no mention of the fact that banks are not tax-exempt. The government has not expressed any intention to discuss the tax situation of banks, but discussion at the pretrial conference expanded to include any discussion of banks. The government argued that

14

the Plaintiff has opened the door to comparing its business to banks – for example, by offering into evidence a document that compares the benefits of credit unions to banks – and thus a full picture might include reference to the fact that banks pay taxes. At this stage, I will bar the government from mentioning the tax status of banks. It is clear that banks will be a topic of testimony in this case, and above I ruled that the evidence prepared by CUNA comparing credit unions to banks will be admissible. In the event this line of testimony becomes extensive, the Plaintiff might open the door to a fuller comparison that would involve the tax question. That, however, is not anticipated, and barring such a development any discussion of the taxation of banks will be excluded.

Plaintiff also moved to exclude testimony about loss ratios. Loss ratios show how many claims are made in relation to the number of policies issued. In other words, they explain how good a value the insurance is for the consumer or, put another way, how profitable the insurance is for the insurer. Plaintiff objects that these are insurance metrics used by the insurance industry and are not used by the credit unions themselves. Moreover, the ratios are backward-looking and thus can present distorted results. For example, an individual would certainly be prudent in purchasing a standard life insurance policy. But that individual has a loss ratio of zero (since he has not died), and thus reference to the loss ratio in that event would paint the decision to buy coverage in an unfairly dim light.

The government states that loss ratios will not be a large part of its case. Moreover, these ratios are an important metric used in the industry and at their essence they measure how good a value the consumer is getting by comparing payouts to premiums. The fact that it is an insurance issue (rather than a credit union issue) is irrelevant, since it's the credit union that is selling the product. Essentially, if the insurance is a bad deal, it's a bad deal. And that, the government

15

believes, undermines the Plaintiff's claim that the insurance is in the best interests of its members. I am satisfied that mention of loss ratios is fair game for the government's case. It has stated that it has no intention of making this into a case about insurance underwriting, and if the issues become too confusing or stray into irrelevant areas, the testimony can be reined in at that time.

In sum, all of the motions to strike and / or exclude testimony are **DENIED**. The motion to play videotaped testimony is **GRANTED**. The motions in limine are **GRANTED** in part and **DENIED** in part, as set forth above and on the record.

**SO ORDERED** this 28th day of April, 2009.

    s/ William C. Griesbach
William C. Griesbach
United States District Judge